Leo A. and Bertha Lippman v. Commissioner.
Lippman v. Commissioner
Docket No. 4784-63.
United States Tax Court
T.C. Memo 1965-73; 1965 Tax Ct. Memo LEXIS 258; 24 T.C.M. (CCH) 399; T.C.M. (RIA) 65073; March 31, 1965
*258 Held, on the facts, the fair market value of certain stock contributed by petitioners to their tax-exempt foundation, not to exceed $500 per share. Edward P. Fillion, 1212 Merchants Bank Bldg., Indianapolis, Ind., for the petitioners. Howard K. Schwartz, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income taxes of petitioners for the taxable years 1959 and 1960 in the amounts of $9,009.02 and $3,348.18, respectively. The sole issue is what was the fair market value on the date of transfer of certain stock contributed by petitioners to their tax-exempt foundation. Findings of Fact *259 The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners are husband and wife and reside in Indianapolis, Indiana. Their Federal income tax returns for the calendar years 1959 and 1960 were filed with the district director of internal revenue at Indianapolis, Indiana. On December 23, 1959, petitioners organized the Leo and Bertha Lippman Foundation (hereinafter referred to as the Foundation) as a not-for-profit corporation organized under the laws of the State of Illinois. On July 5, 1961, respondent, through the district director of internal revenue at Chicago, Illinois, ruled that the Foundation qualified for tax-exempt status under the provisions of section 501(c)(3) of the Internal Revenue Code of 1954. On December 23, 1959, petitioners transferred 16 shares of the common stock of Barrington Heights, Inc. (hereinafter referred to as Barrington), to the Foundation. On their Federal income tax return for the taxable year 1959, petitioners claimed a charitable deduction in the amount of $20,000 resulting from the transfer of this stock to the Foundation. On December 21, 1960, petitioners transferred *260 eight shares of the common stock of Barrington, to the Foundation. On their income tax return for the year 1960, petitioners claimed a charitable deduction in the amount of $10,000 resulting from the transfer of this stock to the Foundation. The deduction in each of these years was calculated on the basis of a valuation of the common stock of Barrington, on the date of transfer of $1,250 per share. In his statutory notice of deficiency, respondent determined that the fair market value of this stock on the respective dates of transfer was $425 per share. Barrington was incorporated under the laws of Indiana on January 1, 1950. Its common stock was issued as follows: Maurice Lippman
1 share
Leo A. Lippman
250 shares
L & L Building Corp.
125 shares
Total
376 shares
Maurice's share of Barrington stock was issued for a consideration of $500. Petitioner's shares were issued in exchange for the transfer of 30.54 acres of land. L & L Building Corporation received its shares of Barrington stock in payment of $62,500 of a contractor's fee owing to it for the construction of rental units on the 30.54 acres transferred to Barrington by petitioner. L & L Building Corporation *261 is a corporation organized under the laws of Indiana on March 23, 1949. As of the date on which L & L Building Corporation received its stock of Barrington its outstanding stock was held as follows: Leo A. Lippman
6,000 shares
Maurice Lippman
1,360 shares
Barrington derives its income from the rental units built by L & L Building Corporation on the land contributed by petitioner. This property is known as Barrington Heights and is located on South Keystone and Minnesota Streets in Indianapolis, Indiana. The improvements consist of 87 separate buildings containing 310 rental units divided as follows: Living
Units
Per
No. of
Total
Build-
Build-
Living
Type
ing
ings
Units
A
2
34
68
B
4
38
152
C
6
15
90
These appartment buildings were constructed by Barrington in 1950 and 1951 pursuant to authority granted it by the Federal Housing Commissioner as FHA Project No. 073-42057 acting under the authority of section 608 of Title VI of the National Housing Act. The units were designed to provide low income housing at a rent of approximately $55 per month. There are few other low income housing projects in the Indianapolis *262 area. The original cost of constructing the project was $1,817,669.14. Barrington secured a loan on the project which was represented by its note as mortgagor to Marufacturers Trust Company, New York, New York, the mortgagee, executed November 1, 1950, in the principal sum of $1,738,200 with interest upon the unpaid balance at the rate of 4 percent per annum. The principal and interest on this note is payable in monthly installments of $7,966.75, which began on August 1, 1951, and is due in full on February 1, 1984. The note securing the project is insured by the Federal Housing Commissioner pursuant to section 608 of Title VI of the National Housing Act. Under this section, the maximum principal obligation insurable by the Federal Housing Commissioner is 90 per centum of the reasonable replacement cost of the completed project. An FHA project analysis dated November 1, 1949, as amended August 8, 1950, estimated the replacement cost of the Barrington Heights project at $1,940,552. Barrington has never defaulted on this note. Barrington Heights is located approximately one and one-half miles south and two and one-half miles east of the commercial center of Indianapolis. The area *263 surrounding the project contains a mixture of residential, industrial and commercial structures. The project itself is within the city limits and all utilities, including electricity, gas, water and storm and sanitary sewers are available at the property. However, part of the neighborhood in which the project is located is outside the city limits. The streets adjacent to the project have no sidewalks, curbs or gutters, but the two interior streets transversing the project have curbs, sidewalks and gutters. There are few sidewalks, curbs and sewers in the area surrounding the project. The residences located in the neighborhood incude both owner-occupied and rental structures. From two percent to ten percent of the dwelling units in the area are in a dilapidated condition. The value of owner-occupied houses ranges from $6,000 to $9,000. Nonwhite occupancy in the area ranges from.5 percent to 74.9 percent with the vicinity of the project being in the higher range. The Barrington Heights project has increased the stability of the neighborhood. The construction of each of the rental units in the project is basically the same. Each unit is approximately 24 X 26 feet in size and contains *264 a living room, a kitchen with dining area, two bedrooms, a bath and a small utility room. There are no closet doors, showers or laundry facilities in the units. The buildings housing these units are of frame construction on concrete foundations with colored concrete floors. Walls are 2 X 4 studding on 24 inch centers with 1/2 inch sheetrock on the inside and asbestos shingles installed on 1 X 2 inch furring strips on the exterior. The buildings give the appearance of having been well maintained. The units originally contained oil potburner furnaces and screen doors. Barrington Heights, Inc., is currently replacing the oil furnaces in the units with gas furnaces and the screen doors with combination aluminum storm doors and screens. These units originally rented for $55 per month. Sometime prior to March 15, 1960, the rent of each of these units was raised to $60 per month. On approximately January 31, 1964, the Federal Housing Administration approved an increase in the allowable maximum average rental for these units to $70.75 per month. The turnover rate in the apartments has been approximately 30 percent and the vacancy rate approximately 6 percent. The assessed value of the *265 real estate owned by Barrington for local tax purposes was as follows during the years 1958 through 1961: Land
$ 22,730
Improvements
320,950
Total
$342,680 (plus exemption $1,000) The true cash value was fixed at $1,031.040. Under Indiana law, the assessed value of real property cannot exceed one-third of its true cash value. The Barrington real estate was reassessed by the local tax officials for determining the property tax liability for the year 1962. In this assessment the true cash value for the land and improvements was determined to be $1,009,200 and the assessed value was fixed at $335,400. On August 20, 1962, Barrington filed with the county auditor a petition to the county board of review in which it sought a review of the assessment of its property for the year 1962. As a basis for this review, Barrington alleged that the assessment was excessive, and that the true cash value of its real estate and improvements was $750,000 and that its assessed valuation therefore should be $250,000. The following are the balance sheets of Barrington showing the book value of its * and liabilities on the dates indicated: ASSETS
December 31, 1959
Cash
$ 2,024.84
Receivables: Tenants
$ 11,252.75
Management
11,946.38
Other
4,000.00
Escrows
15,860.65
43,059.78
Reserve for Replace-
ments: Cash
$ 36,101.90
Securities
85,830.94 *
121,932.84
Investments
24,252.47
Fixed Assets: Buildings
$1,817,669.14
Less Reserve for
Depreciation
497,456.79
$1,320,212.35
Land
125,000.00
1,445,212.35
Prepaid Expenses
5,047.74
Total Assets
$1,641,530.02
LIABILITIES
Accounts Payable
$ 10,193.51
Accrued Taxes and Expenses
26,590.49
Mortgage Payable
1,427,916.21
Net Worth: Preferred Stock
$ 100.00
Common Stock
188,000.00
Earned Surplus
(11,270.19)
176,829.81
Total Liabilities and Net
Worth
$1,641,530.02
*266 The Reserve for Replacement shown on these balance sheets is required by the Federal Housing Administration as a condition of *267 its securing the loan on the Barrington Heights project and the corporation cannot use the funds in the reserve for other than the specified purpose as long as the mortgage insured by the FHA is outstanding. The book value of the common stock of Barrington on December 31, 1959, and December 31, 1960, as shown on the corporation's balance sheets, was $470.03 and $466.90 respectively. Assuming the securities included in the Reserve for Replacements had a market value in the amounts stipulated, the book value as shown on the corporation's balance sheets, so adjusted, would be $476.77 and $497.66, respectively, on December 31, 1959, and December 31, 1960. The net income of Barrington as reported on its corporation income tax returns was as follows in the taxable years indicated: Taxable Income
Taxable Year Ended
(Loss)
March 31, 1951
[15,191.04)
March 31, 1952
7,219.62
March 31, 1953
(6,112.20)
March 31, 1954
8,701.78
March 31, 1955
2,768.25
March 31, 1956
2,255.70
March 31, 1957
784.50
March 31, 1958
10,912.62
March 31, 1959
(12,084.50)
March 31, 1960
(11,953.84)
March 31, 1961
2,999.59
Barrington has never declared nor paid a formal dividend. *268 The fair market value of the common stock of Barrington which was transferred to the Foundation on December 23, 1959, and December 21, 1960, respectively, was not greater than $500 per share. Opinion The sole question here is the value of the Barrington stock on the dates of its transfer by petitioners to the Foundation. The deductions claimed by petitioners in their returns, as charitable gifts, were based on a value of $1,250 per share. Respondent has determined a value of $425 per share. At the trial petitioners and respondent both offered the testimony of qualified expert witnesses in support of their respective determinations of value. In brief, petitioners's valuation of the Barrington stock was based primarily on a capitalization of a "cash flow" from the property of approximately $20,000 per year, representing the average income for the 1956-1960 five-year period, as adjusted. Respondent's witness also made a valuation based on that method, but used an average "income flow" figure for the years 1959 and 1960 instead of the 1956-1960 average, which he adjusted to reflect future operation. His conclusion was that the Barrington common stock had no market value in 1959 *269 and 1960. The witnesses differ also on the economic useful life of the improvements. Some of the adverse factors relied upon by respondent's witness were "economic" and "functional" obsolescence and accelerated depreciation of the housing units. We do not find that the Barrington Heights property suffered any particular disadvantage from obsolescence because of its location or use. The evidence indicates that the properties were subject to no more than normal obsolescence or physical deterioration for residential properties similar in character. On the other hand we think that petitioners' estimate of the net income reasonably to be expected from the property and the assumption of a ready salability for the minority shares at the price claimed shows an optimism not justified by Barrington's earning record and other proven factors. Petitioners' evaluation witness placed a value on Barrington's real estate, including land and improvements, of $1,485,000 at December 31, 1959, and $1,470,000 at December 31, 1960. The witness stated he had no opinion as to the fair market value of the Barrington stock. Another of petitioners' witnesses, the chief accountant for the Lippman enterprises *270 and also treasurer of Barrington, testified that, based on the real estate values as determined by the evaluation witness and making adjustments for the increase in the value of the securities, the book value of the Barrington shares was $582.58 per share at December 31, 1959, and $708.85 per share at December 31, 1960. It does not appear that petitioners' valuation of the shares has taken into consideration that the gift shares represented only a small portion of the outstanding stock in a closely held corporation, which has never paid a dividend and whose losses have exceeded its net income during the ten-year period of its existence to, and including the taxable years. On the evidence as a whole we find that the fair market value of the Barrington stock on the dates of the transfers in question was not in excess of $500 per share. Decision will be entered under Rule 50. Footnotes
*. It was stipulated that these securities consisted of U.S. Treasury Bonds having a market value on December 31, 1959 in the aggregate amount of $88,265.16. ASSETS
December 31, 1960
Cash
$ 418.73
Receivables: Tenants
$ 13,918.90
Management
2,513.23
Other
32,752.77
Escrows
16,483.39
65,668.29
Reserve for Replace-
ments: Cash
$ 35,996.31
Securities
100,281.57 It was stipulated that these securities consisted of U.S. Treasury Bonds having a market value on December 31, 1960 in the aggregate amount of $111,837.81.
*↩
136,287.88
Fixed Assets: Buildings
$1,817,669.14
Less Reserve for
Depreciation
551,986.86
$1,265,682.28
Land
125,000.00
1,390,682.28
Prepaid Expenses
4,944.62
Total Assets
$1,598,001.80
LIABILITIES
Accounts Payable
$ 6,001.24
Accrued Taxes and Expenses
27,627.31
Mortgage Payable
1,388,718.41
Net Worth: Preferred Stock
$ 100.00
Common Stock
188,000.00
Earned Surplus
(12,445.16)
175,654.84
Total Liabilities and Net
Worth
$1,598,001.80